UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


EVANGELENE MONROE,

    Plaintiff,

vs.                                                                              Case No. 16-10079

CONSUMERS ENERGY and                                 HON. AVERN COHN
REBECCA KOSNIK,

    Defendants.
_____/

**MEMORANDUM AND ORDER**
**GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Doc. 23)**
**AND DENYING PLAINTIFF'S MOTION FOR LEAVE TO AMEND (Doc. 29)[1]**

I. Introduction

This is an employment case. Plaintiff Evangelene Monroe (Monroe), proceeding pro se, is suing defendants Consumers Energy and Rebecca Kosnik[2] claiming she was discriminated against in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101–12213 stemming from a decision to have her undergo an independent medical examination (IME) following instances of aberrant behavior and work performance issues. Monroe claims that Consumers Energy improperly "regarded" her as disabled in requiring the IME.

---

[1] Upon review of the parties' papers, the Court deems these matters appropriate for decision without oral argument. See Fed. R. Civ. P. 78(b); E.D. Mich. LR 7.1(f)(2).

[2] Monroe's claim against Kosnik is DISMISSED because the ADA does not impose liability upon individuals. See Lee v. Mich. Parole Bd., 104 F. App'x. 490, 493 (6th Cir. 2004) (citing 29 U.S.C. § 794(b); 42 U.S.C. § 12131(1)). See also Wathen v. General Elec. Co., 115 F.3d 400 (6th Cir. 1997). Going forward, the sole defendant is Consumers Energy.

Before the Court is Consumers Energy's motion for summary judgment.[3]  For the reasons that follow, the motion is GRANTED.  This case is DISMISSED.

## II.  Background

The material facts as gleaned from the record follow.

Monroe began working at Consumers Energy in May of 2000.  At the time of the relevant actions, she was in the Gas Planning Department.  Monroe's job involved the scheduling of gas related jobs.  Beginning in 2010 and continuing through early 2016, Camille Powers (Powers) was Monroe's supervisor in the Gas Planning Department.

In 2013, Powers gave Monroe a high profile assignment.  Monroe struggled with the assignment despite having assistance from Powers.  Eventually, Powers gave the assignment to another employee.  Monroe was upset when Powers reassigned the assignment.

Later in 2013, Powers began to notice work issues involving Monroe.  Specifically Powers observed that Monroe was losing work focus and concentration which affected her work performance.  Powers also observed that Monroe had became increasingly secretive towards her.  Powers also noticed that Monroe was not interacting with her co-workers during staff meetings as she had in the past.  Powers also noted that

---

[3]Also before the Court is Monroe's motion to file a second amendment to her complaint (Doc. 29) and a proposed amended complaint (Doc. 34).  As best as can be gleaned, Monroe seeks to assert a "conflict of interest" claim against Dr. Dutes.  Monroe cites no authority to indicate that such relief is available.  As Consumers Energy states, it appears that Monroe "has confused the idea of attacking the credibility of a witness with having a legal claim that allows for compensation."  Under these circumstances, Monroe's motion to amend is DENIED.  See Fed. R. Civ. P. 15, United States ex rel Harper v Muskingum Watershed Conservancy Dist., 842 F.3d 430, 440 (6th Cir. 2016)(amendment not permitted when the amended complaint would not survive a motion to dismiss).

Monroe's work performance was significantly suffering but Powers did not know why.

On November 27, 2013, Monroe filed a Code of Conduct complaint (complaint) with Consumers Energy's Compliance Department. In the complaint, Monroe stated that she was being tracked and surveilled by her co-workers. A sample of Monroe's allegations in the complaint follow:

- March 2013 - She believes employees began intercepting her personal text messages from her personal phone.
- April/May 2013 - She thinks listening devices were placed in her office to get information to use against her.
- June 2013 - She believes listening devices were placed at her desk by a co-worker and her conversations were overhead by Company employees. While at the Somerset Mall, she thought she saw her supervisor driving in the Mall parking lot looking for her.
- July 2013 - She thought she was being recorded in her cubicle.
- September 2013 - She believed she was being recorded via her personal phone and was being surveilled via cameras at work and at home.
- October 2013 - She thought her co-workers were taping her calls at work. She goes to the Apple Store and is told that this was not possible.
- November 11, 2013 - She thought two co-workers were recording her and that a listening device was installed in the office next to hers.
- November 13, 2013 - She goes to her home cable provider (Comcast) to determine if a sensor (surveillance device) was on her home cable service. Comcast tells her this has not occurred. She files a Police complaint against two of her co-workers.
- November 15, 2013 – She believes a GPS tracking device is installed on her car by her co-workers and her conversations were being listened to via the key FOB for her vehicle.

See Consumer's Energy Exhibit 2, Code of Conduct Complaint.

As a result of the allegations in the complaint, Kathleen Delaney (Delaney), a Director in the Human Resources Department, conducted an investigation in early January of 2014. Delaney did not find any merit to any of Monroe's allegations against her co-workers regarding surveillance, recording and intercepting of calls and texts. As part of her investigation, Delaney also talked with Powers. Powers informed Delaney

that Monroe had been losing work focus and concentration which negatively affected her work performance. Powers also told Delaney that Monroe was no longer interacting with her co-workers during staff meetings. Delaney then met with Monroe in late January 2014. During the meeting, Monroe insisted that her co-workers were tracking her as noted in her complaint.

Due to the nature of the allegations, the results of the investigation, and Monroe's performance issues, Delaney arranged to have Monroe scheduled for an IME to determine if she was able to perform the essential functions of her job.

A few days after the meeting between Delaney and Monroe, Powers found Monroe at her desk crying. Powers contacted Delaney who told Powers to place Monroe on paid sick leave. When Powers went back to tell Monroe, Monroe had left work. Powers ended up sending Monroe a letter telling her that she was on paid sick leave. Powers was later informed that earlier the same week Monroe had been found crying in a conference room.

In February of 2014, Monroe had an Independent Neuropsychological Evaluation conducted by Dr. Jean-Claude Dutes, PhD, of MSU Rehabilitation. In his report issued in March of 2014, Dr. Dutes found that Monroe was having concentration issues and work efficiency issues. Dr. Dutes reported: "[t]here were indications of a high degree of interpersonal sensitivity, tendency toward paranoid thinking and difficulty in interpersonal relationships. This examinee is likely to appear guarded and suspicious of others..." Dr. Dutes recommended that, prior to returning to work, Monroe should complete 12 sessions of psychological counseling and then have a re-evaluation by her therapist. Following are excerpts from the report and addendum:

> REASON FOR EVALUATION
> Mr. Steven Bush of Consumers' Energy referred the examinee, a 43-year-old African American woman, for this Independent Neuropsychological Evaluation due to reports of declining work performance and interpersonal difficulties in the work setting.
> * * *
> CLINICAL IMPRESSIONS
> … there were indications of a high degree of interpersonal sensitivity, tendency toward paranoid thinking and difficulty in interpersonal relationships. This examinee is likely to appear guarded and suspicious of others and to be highly anxious about the possibility of losing her job or being reassigned to a less desirable position. Although she has sufficient neurocognitive resources to perform adequately in her position, given the stressors she is facing, she is at risk for having concentration difficulties that could contribute to lowering her efficiency. Improved stress management and coping ability would decrease her perceived stress level and contribute to improved work performance.
> RECOMMENDATIONS
> 1. The examinee would benefit from engaging in short-term psychological counseling using a solution or problem-solving approach. She is unlikely to be successful with insightoriented psychotherapy approaches.
> ADDENDUM
> 2. At least 12 sessions of psychological counseling to assist the examinee in:
> a) Becoming more aware of her interpersonal style and its effects in the work setting.
> b) Learning more effective conflict resolution skills.
> c) Improving her stress management and coping skills.
> 3. Return to work contingent upon her therapist's assessment of her work readiness and a re-evaluation of her psychological status and sustained attention functions.

See Consumers Energy;'s Exhibit 5, Dr. Dutes Initial Report and Addendum.

Monroe refused to attend the 12 counseling sessions as outlined by Dr. Dutes. In the meantime, she remained on paid sick leave from late January 2014 until October 26, 2014. At that time, Monroe filed for and obtained unemployment benefits and also obtained part-time employment.[4]

---

[4]During this time, Monroe also retained at least two different attorneys, each of whom contacted Consumers Energy. Consumers Energy provided each attorney with a copy of Monroe's personnel file and told each attorney that Monroe's failure to follow Dr. Dutes' recommendations was preventing her from returning to work. See Consumers

In late 2014, Monroe contacted Delaney about returning to work in 2015. Delaney told Monroe that she had to comply with Dr. Dutes' recommendations prior to returning to work. Monroe explained to Delaney that she was much better and did not need any counseling. In response to Monroe's statements, Delaney scheduled Monroe for a follow up Neuropsychological Evaluation with Dr. Dutes. Dr. Dutes conducted a second examination in April of 2015 and issued a second report in May of 2015. Dr. Dutes found that Monroe's neurocognitive status had improved and there was a lessened chance of her underperforming in her work. However, Dr. Dutes still believed that Monroe needed to participate in the psychological counseling and could go back to work contingent upon undergoing the required treatment. Following are excerpts from the second report:

> RECOMMENDATIONS
> The recommendations are the same as from the last evaluation, with the exception that the company considers allowing her to return to her position while she undergoes psychological treatment as opposed to afterwards. This is based on the fact that her neurocognitive status appears to have significantly improved and, as a result, psychological distress is unlikely to compromise her neurocognitive functioning as much as it would have a year ago. In other words, she is less likely to underperform in her job at this time than she was a year ago.
> 1. The examinee would benefit from engaging in short-term psychological counseling using a solution or problem-solving approach. She is unlikely to be successful with insight-oriented psychotherapy approaches.
> 2. 8-12 sessions of psychological counseling to assist the examinee in:
> a) Becoming more aware of her interpersonal style and its effects in the work setting.
> b) Learning more effective conflict resolution skills.
> c) Improving her stress management and coping skills.
> 3. Return to work contingent upon the employee agreeing to undergo treatment as a condition of return to work.
> 4. The development and implementation of a correction plan that stipulates

---

Energy's Exhibit 9, selected email correspondence.

6

desired behaviors, performance expectations and expected time frame within which they should be met.

See Consumers Energy's Exhibit 6: Dr. Dutes second report.

In July of 2015, Monroe filed an EEOC complaint claiming an ADA violation. As explained by Monroe at her deposition, she was not satisfied with the EEOC investigation because the investigator apparently told her that she needed to undergo the required counseling in order to return to work.

In November of 2015, after several months and numerous emails between Monroe and Delaney, Monroe finally enrolled in the required counseling. After completing the counseling and a required drug screening due to length of time away from work, Monroe was returned to full time employment starting December 9, 2015.

On January 6, 2016, Monroe filed the instant complaint.

### III. Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A moving party may meet that burden "by 'showing'-that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Rule 56 provides that:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits, or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of

> a genuine dispute, or that an adverse party cannot produce admissible evidence to support a fact.

Fed. R. Civ. P. 56(c)(1).

The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." In re Dollar Corp., 25 F.3d 1320, 1323 (6th Cir. 1994) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)). In so doing, the Court "must view the evidence in the light most favorable to the non-moving party." Employers Ins. of Wausau v. Petroleum Specialties, Inc., 69 F.3d 98, 101 (6th Cir. 1995).

IV. Analysis

A. The ADA

The ADA provides that a covered employer "shall [not] discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Where, as here, there is no direct evidence to support a plaintiff's claim, courts apply the McDonnell Douglas burden-shifting test framework. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–06 (1973). Under this framework, if the plaintiff can establish a prima facie case of discrimination, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for its actions. Sullivan v. River Valley Sch. Dist., 197 F.3d 804, 813 (6th Cir.1999). If the defendant does so, the burden shifts back to the plaintiff to show that the defendant's proffered reason is a pretext for unlawful discrimination. Id. The alleged discrimination must have been a "but-for"

8

cause of the adverse employment action by the employer. Lewis v. Humboldt Acquisition Corp., 681 F.3d 312, 321 (6th Cir.2012)(en banc).

To make out a prima facie case under the ADA, a plaintiff must show that she is (1) a disabled person within the meaning of the ADA, (2) that she is otherwise qualified to perform the essential functions of her job with or without reasonable accommodation, and (3) that she suffered an adverse employment decision due to her disability. Sullivan, supra, at 810. The ADA defines a disabled person as one who (1) has a physical or mental impairment that substantially limits one or more of the person's major life activities, (2) has a record of having such an impairment, or (3) does not have an impairment, but is regarded as having one. See 42 U.S.C. § 12102(1)(C) and (3)(A)(2009); Gecewicz v Henry Ford Macomb Hosp. Corp., 760 F. Supp. 2d 732, 738 (E.D. Mich. 2010) ("The term 'disability' means, with respect to an individual, being regarded as having such an impairment ....").

Here, Monroe does not allege that she has a qualifying physical or mental impairment under the ADA. Rather, she brings a claim under the "regarded as" provision, 42 U.S.C. § 12102(3)(A). A person is "regarded as" being disabled under the ADA "if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." Id. The Supreme Court explained how courts should analyze and apply the "regarded as" provision of the ADA:

> There are two apparent ways in which individuals may fall within this statutory definition: (1) a covered entity mistakenly believes that a person has a physical impairment . . . or (2) a covered entity mistakenly believes that an actual,

9

nonlimiting impairment substantially limits one or more major life activities. In both cases, it is necessary that a covered entity entertain misperceptions about the individual-it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting.

Sutton v. United Air Lines, 527 U.S. 471, 489 (1999).

### B.  Application

Consumers Energy says that there is no genuine issue of material fact as to whether Monroe suffered an adverse employment action or whether Consumers Energy regarded her as disabled under the ADA.  The Court agrees.

Viewing all of Monroe's factual allegations in the most favorable light, her only evidence that Consumers Energy perceived or regarded her as disabled is that it referred her for an IME and placed her on paid sick leave of absence after Monroe exhibited unusual behavior and her work performance was suffering.  Monroe does not allege that Consumers Energy made up or exaggerated the events, circumstances and statements that Delaney relied upon in referring her for an IME or for placing her on a paid sick leave in late January 2014.  Indeed, Delaney relied in large part on Monroe's complaints in determining to send Monroe for an IME.

Even assuming Monroe could establish that Consumers Energy's actions were based on a belief that mental health problems were negatively impacting her ability to do her job, this does not make out a prima facie case under the ADA.  "A defendant employer's perception that health problems are adversely affecting an employee's job performance is not tantamount to regarding that employee as disabled." Sullivan, 197 F.3d at 810.  In fact, an employer's request that an employee undergo a medical exam is not evidence of discrimination because it "does not prove that the employer perceives

10

the employee to have an impairment that substantially limits one or more of the employee's major life activities." Id. at 811. Indeed, in Sullivan, the Sixth Circuit explicitly said that an employer has the right to determine the cause of an employee's aberrant behavior:

> Sullivan's evidence that his employer treated him as impaired is that his employer asked him to undergo mental and physical examinations to determine his fitness as a teacher following his allegedly exhibiting some unusual behavior. Given that an employer needs to be able to determine the cause of an employee's aberrant behavior, this is not enough to suggest that the employee is regarded as mentally disabled.

Id. at 810-11. The Sixth Circuit went on to explain:

> In addition, employer-requested medical and psychological evaluations are in full compliance with "the interpretation in [EEOC] regulations" and are permissible if "restricted to discovering whether the employee can continue to fulfill the essential functions of the job."

Id. at 811-812 (citing EEOC regulations at 29 C.F.R. Part 1630.14(c)). The Sixth Circuit also made clear that health or behavior problems which affect an employee's performance of essential job functions justify an employer's ordering of an IME "even if the examination might disclose whether the employee is disabled or the extent of any disability." Id. at 812. Sullivan and cases following it have clearly established that an employee "may not dictate the terms of [her] medical examination" and an employer can require compliance with the examination as a condition of returning to work. See Pena v. City of Flushing, 651 Fed Appx 415, 422 (6th Cir. 2016)(citing Sullivan at 809 n. 2, 812).

Indeed, the ADA permits medical and psychological examinations consistent with business necessity. Section 12112(d)(4)(A), prohibits employers from "requir[ing] a medical examination" or "mak[ing] inquiries of an employee as to whether such

11

employee is an individual with a disability ... unless such examination or inquiry is shown to be job-related and consistent with business necessity." If a mandatory medical examination can be shown to serve a legitimate business purpose, it is permissible. See Kroll v White Lake Ambulance Auth, 691 F3d 809, 815 (6th Cir. 2012). "[T]he ADA permits an employer to require a medical examination to determine qualifications for the job and for the health and safety of employees." Marotta v. Ford Motor Company, 119 F. Supp. 3d 676, 697 (E.D. Mich. 2015)(quoting Coulson v. The Goodyear Tire & Rubber Co., 31 F. App'x 851, 855 (6th Cir. 2002).

Here, Monroe's unusual behavior, including the nature of allegations against her co-workers in her internal complaint, coupled with performance issues would have caused any reasonable employer to inquire as to whether she was still capable of effectively doing her job. No reasonable juror could conclude otherwise. Rather, the undisputed facts show that Consumers Energy had a reasonable basis for referring Monroe for an IME to evaluate whether her actions could have been undermining her ability to effectively do her job. Because Monroe cannot show that her IME referral was done for invalid reasons, she cannot establish that it was an adverse employment action or was discriminatory. As such, she cannot make out a prima facie case under the ADA.

Even assuming Monroe established that she suffered an adverse employment action by having to undergo an IME, summary judgment is still appropriate. While Monroe says that Consumers Energy delayed in returning her to work, it is clear that Monroe refused to undergo counseling for several months which prevented her return to work. To the extent there was any miscommunication as to Monroe's return to work, it

was not discriminatory. See Johnson v Univ Hosps. Physician Services, 617 Fed Appx 487, 491–93 (6th Cir. 2015) (holding that miscommunication between the parties about when employee would return to work did not support regarded as ADA claim).

C. Monroe's Response

In her response, Monroe says that her work performance was not suffering. She relies on a 2013 PEFD (performance review) which was completed prior to the time in which her performance declined. The episodes of her crying at work and then disappearing from work did not occur until the end of January 2014. The 2013 PEFD was last updated (and reviewed with Monroe) in October 2013. No review of the last two months of 2013 ever occurred because by that time Monroe was already gone on paid sick leave. And neither Monroe nor Powers signed the 2013 PEFD. Thus, the 2013 PEFD does not support her ADA claim.

Monroe also says that the investigation into her complaint was insufficient, implying that the investigation should have revealed that her allegations of surveillance and other actions by her co-workers were true. However, Monroe herself testified at deposition that she had no evidence to support her allegations. That Consumers Energy also did not find any evidence to support her claims does not mean that Consumers Energy violated the ADA.

Monroe also argues that she received FMLA time she did not request. She also says she suffers from a sinus condition and high blood pressure. Putting aside whether a complaint of receiving too much FMLA is viable, Monroe did not assert an FMLA or other claim about her health in her EEOC complaint nor would the EEOC reasonably be expected to investigate these claims nor was Consumers Energy on notice of these

13

claims based on her charge. As such, Monroe cannot pursue them in this case. See Younis v. Pinnacle Airlines, Inc., 610 F.3d 359, 361 (6th Cir. 2010).

In the end, as Consumers Energy aptly states:

> While Plaintiff may believe that she has been wronged in many ways, the complaint she filed alleging violations of the ADA is not legally supported. The facts Plaintiff believes or thinks to be true, are not relevant to the legal issues before this Court.

(Doc. 26 at p. 3).

SO ORDERED.

                                      S/Avern Cohn
                                      AVERN COHN
                                      UNITED STATES DISTRICT JUDGE

Dated: 10/19/2017
      Detroit, Michigan